437 P.2d 442

Bion TOLMAN and Lucille Tolman, his wife, Karl J. Hawkins, Jr., and Miriam Hawkins, his wife, Bruce B. Anderson and Dorothy O. Anderson, his wife, K. Jay Holdsworth and Dona Holdsworth, his wife, and Emerson Kennington and Audrie M. Kennington, his wife, Plaintiffs and Appellants,

v.

SALT LAKE COUNTY, Oscar Hanson, Jr., Philip Blomquist and Marvin G. Jensen, Individually and as Members of the Board of County Commissioners of Salt Lake County, Ralph Y. McClure, County Zoning Administrator, and Lane Ronnow, Director of Building Inspection Department of Salt Lake County, Defendants and Respondents,

Bill Roderick, Inc., Intervenor-Respondent.

No. 10935.

Supreme Court of Utah.

Feb. 6, 1968.

K. Jay Holdsworth, of Fabian & Clendenin, Salt Lake City, for appellants.

T. Quentin Cannon, Salt Lake City, for respondents.

Everett E. Dahl, Leon J. Zanoni, Midvale, for intervenor-respondent.

HENRIOD, Justice.

Appeal from a judgment denying a petition for a temporary injunction in a zon-

ing case, where a variance from the Master Plan had been approved by the Salt Lake County Commission, from residential to commercial use. Reversed.

As a preliminary matter we decide that Tolman's contention that further proceedings automatically should be allowed on dismissal of the petition for temporary injunction need not be determined here. We do this for two reasons: 1) That what appeared to be an ex parte matter, because of some sort of undisclosed misunderstanding, extended considerably beyond the scope of the petition's function, and that anyway 2) the matter is moot because of what we decide here.

For a proper understanding of our determination, pro or con, it seems necessary to chronicle somewhat in extenso the facts, most of which are conceded to be true by counsel for both sides, with observations herein stated.

Sometime along about August, 1966, three residents of the general area had heard rumors that a corner lot at 2300 East and 4500 South, where some of the heaviest traffic in the county was extant, might be the subject of an application for rezoning from residential to commercial use in contravention to the master zoning plan then in effect. They approached Mr. McClure, Administrator of the Salt Lake County Planning Commission, personally and by several phone calls, expressing their concern. They were told that before there would be any rezoning there would be posting of notice in a conspicuous place and that the names of neighbors in the area would be obtained. One of the inquirers took this to mean letters would be written to the area residents alerting them as to any projected application to rezone. None was ever written. Besides, Mr. McClure said that the Planning Commission would reject any such attempt,—which it did. The inquirant met with the Planning Commission later on when the matter came up and was told that the application of Roderick, filed theretofore, would not be approved, and consequently, "we felt safe," —also that he saw nothing on any poles.

On November 3, 1966, Roderick filed his application for a variance, and although the form was accompanied by printed instructions, one was that under "Data Required": No. 4 required "Names and addresses of all persons who own property * * * within 150 feet * * * of the subject property," the applicant furnished none. Nor did he furnish a signed statement from owners of property affected, indicating their attitudes as to the rezoning, which also was required. Nor did he file two copies of a preliminary development plan as required by the information or instruction sheet. For some undisclosed reason, under "List the complete legal description of the property," the legal description given was crossed out by a large cross,— but such description certainly was not the

same as appeared in the newspaper publication of notice, unless by way of paraphrasing,—and no one short of an abstractor or real estate draftsman could reconcile the two.

On November 4, 1966, the day after the application was filed, Mr. McClure, Zoning Commissioner, dispatched a letter to Mr. Florence, Chairman of the *District* Planning Commission, composed of Florence, Hall and Kleiner, stating that Roderick had filed the application, asking for a recommendation and suggesting that "After you have reached a decision, which should be as soon as possible, fill in the enclosed form in detail and return it to our office." At this time Mr. Florence was packing to go on a mission for the Church. He gave the letter and form to Hall, who was not the chairman, but who ultimately signed the form as chairman. Shortly thereafter Roderick called *Hall,* not *Florence,* and asked if he, Hall, could get the form in by a certain date. About the same time, Hall had a phone call from a brother-in-law, who was an acquaintance of Roderick, who inquired what Hall could do about it. Hall did not contact the other members of the District Committee, there was no public hearing had, and he mailed the form that was to represent the action of the *District* Committee on November 18 or 19, which was unavailable to the Salt Lake County *Planning* Commission at its scheduled meeting of November 18, 1966, *where the latter commission disapproved the application.* On the form mailed by Hall on the 18th or 19th, there was not too much "in detail" as requested in Mr. McClure's letter to Florence (supra). "Field trip to the property" was blank. No public meeting was reported. Significantly, however, under "list the reactions of the surrounding property owners," it was noted that "One preferred that homes would be built rather than commercial building," another "opposed the increased traffic it would bring to Russell Street" (a narrow street), and another by Mr. Florence, chairman, "Don't we have enough service stations?" The "Decision" was "Approved with stipulations." Mr. Hall did not state thereon what the "stipulations" were, but he testified that the approval was conditioned on consistency with the Master Plan. In the meantime Florence had left the country. There never was a majority of the committee that acted on this "Approval," —only Hall.

On November 8, 1966, two of the three incumbent county commissioners, Larson and Creer, were defeated in the election by Hanson and Blomquist, thus creating a commission two of the members of which would retire in January, 1967.

On November 18, 1966, the Salt Lake County Planning Commission met. It had not heard from the *District* Committee. There was no notice of the meeting given to the three residents who previously had

talked to Mr. McClure personally and by phone. One of the three residents mentioned happened to be present, however, and noticed the meeting's agenda, but was told that the application likely would not be approved. The Salt Lake County Planning Commission had before it the recommendation of its three-man subcommittee, which unanimously recommended denial of the application, one member stating in its report: "R 5. no. bad access on 23rd," another saying "No Deal," and the third saying "R–5 better."

On November 19, Hall, of the District Planning Commission, mailed in his sole approval under the circumstances mentioned above.

On November 22, 1966, the County Commission set a date for public hearing on December 28, 1966.

On November 23, one day later, Roderick signed a purchase agreement for the subject property.

On November 23, a notice of the public hearing, according to the testimony of one Evans, employee of the Zoning Administrator, was tacked on a bulletin board at the west entrance of the City and County Building (being roughly nine miles from the subject property).

On November 25, one Hardman, another employee, tacked two such notices on telephone poles, one being near the intersection of 2300 East and 4500 South and the other on the next pole south, about 175 feet. Both poles were situate on 2300 East, one in front of the subject property, and the other in front of private property immediately to the south. Both signs were posted about seven feet high and both faced the 2300 East traffic. Mr. Hardman's affidavit also stated that he posted a third notice on the board at the west entrance of the City and County Building. This may have been an error since Mr. Evans said that he posted a notice there on November 23rd. If there were no error it is obvious that two such notices were posted at the City and County Building. An interesting observation is that although proof of posting ordinarily is prepared and filed the next day, Mr. Hardman's proof of posting was sworn to on December 15, 1966, some three weeks later. His testimony also was to the effect that the notices he posted were similar to a blank form he displayed in court; that customarily a copy of the notice posted was kept on file in the office; that he was not sure when he posted the notices; that he never returned to the site to see if they remained posted; that if anyone went from Russell Street west on 4500 South, then south on 2300 East, it would be difficult for him to see the notices he posted, and the same would be true if a person walked north on 2300 East past the poles.

On November 26, 1966, a notice was printed in a paper of general circulation in the County.

On December 13, 1966, Mr. McClure wrote a letter to Roderick reminding him of the public hearing on December 28, stating "You or your authorized agent are requested to attend this hearing to present any information which may be pertinent to this application." It seems highly significant to us in establishing our conclusion anent notice, that the same courtesy was not extended to any adjacent property owners on any side of the subject property, —and that if the notice given by posting and publishing,—that Roderick's counsel, and counsel for the zoning authorities contend was quite sufficient for long-time residents of the area, it should have been sufficient for Roderick, who, it must be conceded, was a sort of Johnny-Come-Lately to the area. His ownership of the property at time of his application was seriously debatable, being in the form of an earnest money receipt. It appears that his obvious purpose in the rezoning was not to promote the general weal of the community, but only to lease three pieces of the property to others, who also had no interest in developing the property other than personally to profit thereby. This conclusion is inescapable from the latter's own testimony as to the amounts he would receive on leases for which he had offers, that he could use the property for no other purpose, and would be hurt if the rezoning were denied.

On December 28, 1966, at the time set for[1] hearing, Roderick, his attorney, and what obviously were Roderick's witnesses, including the realtor who made the sale, and four others, none of which gave any real reason for classifying the property as commercial rather than residential, showed up. There is absolutely nothing indicating that they showed up because they read of the application in the newspaper, or were moved to appear by reading anything on a telephone pole,—or even that they were owners of property either close or distant from the subject property. On the other hand, no one owning property abutting the property in question, showed up. This is mute evidence of the fact that the notice given did not serve the letter and spirit of the statute that required a notice "designed to give notice thereof to the persons affected."[1] Particularly is this true in view of the fact that immediately after learning of the rezoning some 200 "persons affected" petitioned the County Commission for reconsideration. On the same day of the hearing, December 28, 1966, three days before two of the three members of the Commission were to be retired, the application was taken under advisement subject to approval later,—which was accomplished by the new Commission about two weeks later.

On January 10, 1967, the petitioners herein personally appeared before the new Commission, Hanson and Blomquist, who were

---

1. Title 17–27–17, Utah Code Annotated 1953.

sworn in on January 1, 1967, only nine days before, with a written petition signed by every property owner abutting the subject property, plus 200 other "persons affected" by the rezoning. *The zoning amendment then had not been approved.*[2] On the very next day Blomquist, acting as temporary chairman of the Commission, Hanson being excused, signed an ordinance providing for the amendment.

On January 17, 1967, several of the signers of the petition for reconsideration and hearing appeared again before the Commission protesting the action of the Commission of January 11th. The Commission refused to consider the protest on the ground the ordinance had been signed, and on January 25, 1967, this petition for a temporary injunction was filed.

In addition to the facts stated above, in chronological order, there are others developed at the hearings of this matter which appear to be apropos.

Mrs. Kennington, who lives across the street from the subject property, testified that, having heard something about zoning the adjacent property, visited with Mr. McClure, Zoning Administrator. He advised that before any change in the zoning, a posting would be made on a telephone pole; that he gave her a paper to look for; that she looked but never saw such a notice like that on the poles; that she worked for the school lunch program, drove to and from work, also walked past the poles in question and saw nothing, and found out that the property had been rezoned from a neighbor thereafter.

A Mr. Ekins, a ski instructor, was called by Roderick to testify in his behalf. This as a result of Mr. Roderick's son, Jim, calling Ekins, a good friend at school, the day before the hearing, asking him which way he drove to work. That he replied sometimes down 23rd East, usually turning up 45th South. He said Jim asked him if he ever saw a zoning sign or anything, and I told him "Not that I can ever remember." He asked me if I would come down the next day and be a witness and talk to his dad's lawyer. I asked him what about, and he said "Well, we own this property, or something." Then I remembered driving down the street with my friend named Locke about Christmastime and we noticed the sign and Locke said "Hey, maybe they are going to zone this place so we won't be able to have any horses." I didn't think about it any more. He said he could see the signs real good and remembered the red letters. They didn't stop and read them.

One Holly, deputy sheriff, testified that he checks and posts notices every day on the board at the west entrance to the County Building; that so do deputies Gunn, Savage and Stone; that he never saw a notice like the one in evidence posted there.

---

2. There is some similarity here to a case recently decided by this court, Jensen v. Bountiful City, 20 Utah 2d 159, 435 P.2d 284, December 12, 1967.

At that point counsel for the zoning authorities said "We will stipulate that there was never such a notice posted of this nature posted on this west bulletin board." [3] Holly continued by saying he never noticed any zoning ordinance notices posted there. It was stipulated that the other three deputies likewise would testify, except that Mr. Olsen, Deputy County Clerk, might be more lucid. Counsel for defendants again stipulated that "there was no such notice ever posted on the west board." Olsen, mentioned above, said occasionally he saw a zoning notice posted, but did not recall seeing one like this.

Mrs. Keller, living on the corner of Russell Street, across from the subject property, heard of the December 28th rezoning from her son who called her; that she walked past the poles on 23rd East, two or three times a week, including Christmas Eve, looked at all the poles, saw nothing thereon; that she saw no surveying, no stakes driven on her property and saw only one sign on a pole, not the ones here, that advertised a candidate for sheriff.

Mr. Henrichsen, owner of property immediately south of the subject property, where it was asserted a notice was posted on a pole in front thereof, saw nothing during the period of posting asserted, though he cleaned the walks periodically; that Roderick never told him of any proposed change in the ordinance; that he received no notice through the mail and afterward learned of the change through a neighbor; that personally he had been neither for or against zoning.

There was a proffer of proof that five different residents, living in cul du sac streets, had to use 23rd East to go to church and to Holladay (south of the intersection) in cars, who did not see the notices. At this juncture, even the trial court judge remarked that "I can tell counsel that I drive by that street frequently. I didn't see them"

The affidavit of posting referred to an attached copy. None was attached to the affidavit offered in evidence. It was then stipulated that Roderick did not supply names of adjacent property owners on his application, and that the only notice of the public hearing by mailing was to Roderick only.

From the foregoing facts reflected in the record and in the testimony, most of which were uncontroverted, we now have to determine the merits of appellants' points on appeal, only three of which need treatment here:

1. Whether adequate notice was given under the statute;

2. Whether the appellants were deprived of constitutional requirements of due process; and

3. Whether the County Commission acted arbitrarily and capriciously.

As to 1): The governing legislation is Title 17–27–17, Utah Code Annotated 1953, that says in a case like this, publica-

---

3. It seems that this case could be decided on this stipulation of facts alone.

tion must be had in a newspaper and "by posting in three public places designed to give notice thereof *to the persons affected."*

Under the facts of this case, where notice was posted at the courthouse nine miles away from the subject property, and far removed even from the district zone contemplated by the Master Zoning Plan, hardly can be said to be a place designed to give notice to the persons affected, owning property and residing in such a remote area. Nor can it be said that two telephone poles, on one and the same street, 175 feet apart, having notices posted thereon facing away from the subject property, but on the contrary, facing traffic of an arterial highway where a motorist may have been arrested if he stopped to read the notices, are public places that reasonably could be contemplated under the statute mentioned.

Where people rely on zoning ordinances and a drastic change in use is suggested by someone (as is the case here), involving the depreciation in value of nearby properties, it seems to us that there is a fairer, more reasonable way to apprise the owners thereof than the postings mentioned above, unseen and unheard of by the persons affected, including owners of property completely surrounding the property sought to be rezoned,—who knew nothing about the public hearing thereon, albeit strangely

enough the applicant for the change knew all about it by the simple vehicle of *having been advised of the time and place thereof by mail directed to him* by the Zoning Administrator, but to *no one else* by the same media. We think the legislature so contemplated.

There is no way to distinguish the instant case from our case of In re Phillips' Estate,[4] except to say that the facts and reasoning in that case apply with greater emphasis as to the facts and procedure here, and we have no inclination presently to overrule that case, where three postings were made on three poles at a ten-acre courthouse tract, which we said were not three public places but only one. We do subscribe to the idea, however, extant rules concerning giving notice where property values seriously may be affected, are archaic in this complex era. Especially is this true in the zoning area, which still is in its infancy.[5]

Our feeling pretty much is expressed in Mullane v. Central Hanover Bank,[6] where it was said:

The fundamental requisite of due process of law is the opportunity to be heard. * * *

An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality

4. 86 Utah 358, 44 P.2d 699 (1935).

5. Rhyne, Municipal Law, Chap. 32, p. 810 et seq.

6. 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections. * * * *A notice must be of such nature as reasonably to convey the required information* * * *and it must afford reasonable time to those interested to make their appearance.*

, We do not believe this simple, understandable and fundamentally sound expression of constitutional perquisites was followed in the instant case.[7]

As to 2): Due process. We would have to agree that due process requirements were departed from here, from what is said above, and we so hold.

As to 3): Arbitrariness and capriciousness of the County. Such words are harsh and we would rather say that the outgoing Commission, what with moving out, files, records and the like at an 11th hour, and the moving in of a new Commission of files, desks, records, timidity and inexperience, does not reflect any characterization by such words, but only lends credence to the fact that circumstances sometimes unwittingly may lend themselves as factors in a question of constitutional rights of due process guaranteed to "persons affected."

This court hardly can criticize the zeal of a business man, the judgment of notice posters or the conscience of rushing outgoers or incomers when time and practicality may affect efficiency. However, looking at this case in the aggregate, we are constrained and believe that this case must be initiated anew with a new application, if the applicant thinks it feasible, in consonance with not only what we say here, but also in the light of the authorities, —and so we hold. (Emphasis supplied.)

CROCKETT, C. J., and CALLISTER and TUCKETT, JJ., concur.

ELLETT, Justice (concurring in the result).

I concur in the result reached but do so solely on the basis that the posting of two notices on adjacent telephone poles was not a posting in two separate places within the meaning of Section 17–27–17 of our statute. That posting was at one public place only; and since the only other claimed place of posting was at the County Building, the notices were posted at only two public places. (See In re Phillips' Estate, 86 Utah 358, 44 P.2d 699.)

7. See note 6, supra.